IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PATRICK TIMOTHY HEGARTY, | ) | Civil Action No.  2:21-cv-21 |
| | ) | |
| Plaintiff, | ) | Filed Electronically |
| | ) | |
| vs. | ) | |
| | ) | |
| THE BANK OF NEW YORK MELLON | ) | |
| CORPORATION a/k/a BNY MELLON | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes the Plaintiff, PATRICK TIMOTHY HEGARTY, by and through his

attorneys, HORNE DALLER LLC, and files this Complaint, the following of which is a

statement:

**JURISDICTION AND PARTIES**

1.      Plaintiff, PATRICK TIMOTHY HEGARTY, is an adult individual with a

principal residence at 271 Mabrick Avenue, Allegheny County, Pennsylvania 16509.

2.      Defendant, BNY MELLON ("BNY") is an investment company registered under

the laws of the state of New York headquartered in 240 Greenwich Street, New York City,

Manhattan County, New York 10286.

3.      BNY operates in 35 countries, employing more than 45,000 people.  BNY

maintains a substantial presence in and has substantial administrative and operational functions

within the Western District of Pennsylvania.

4.      At all times material hereto, Mr. Hegarty was located at and performed all of his employment functions out of BNY's Pittsburgh office in 500 Grant Street, 37th Floor, Pittsburgh, Allegheny County, Pennsylvania 15259.

5.      During his time with BNY, Mr. Hegarty held the position of Senior Director, BNY Mellon Wealth Management, whose duties included preparation of technical presentations to BNY Mellon clients, maintenance and development of the firm's analytic tools, as well as assisting in investment research.

6.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this action involves citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.

7.      Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) because, at all relevant times hereto, Defendant conducted business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## FACTUAL BACKGROUND

*Departure*

8.      Mr. Hegarty was employed by BNY Mellon for twenty (20) years and most recently held the position of Senior Director, BNY Mellon Wealth Management, before tendering his resignation.

9.      On March 19, 2019 Mr. Hegarty tendered his resignation, complying with BNY Mellon's mandatory 60-day notice.

10.     On the same day Mr. Hegarty contacted his manager at BNY Mellon about how to best handle his benefits, including benefits regarding his stock options.

11.     Mr. Hegarty's manager told him to wait and allow HR to contact Mr. Hegarty to 'offboard him,' pursuant to BNY Mellon's "Offboarding-emp-guide-us" document.   This is part of a process, and further represents the importance of the BNY Mellon's Exit Interview process:

> Our BNYM global exit interviewing process supports our 'best in class' candidate experience and furthers our culture of continuous improvement.  We want to ensure that we engage our employees as they leave our organization voluntarily, enable them to share feedback on their work experience, and collect information related to their decision to pursue other opportunities (if applicable). We plan to use this information to assess potential improvements in, and to bolster, talent acquisition efforts, retain key talent, and optimize our BNY Mellon High Performance Culture. Please expect to receive an exit interview survey link shortly after you share your resignation with your manager.

12.     Mr. Hegarty did not receive this document and did not have access to it until after his stock options had expired.

13.     In his resignation notice on March 19, 2019, Mr. Hegarty indicated that he would be leaving employment in 60 days, on May 19, 2019, to commence self-employment.

14.     Two days later, on March 21, 2019 Mr. Hegarty was involuntarily escorted from the work premises.

15.     Mr. Hegarty was denied the opportunity to collect his personal belongings, nor was he given the chance to review any offboarding documents.

16.     Mr. Hegarty was told by his manager that he would lose all his access, to the premises, systems, and otherwise on March 21, 2019. While BNY Mellon did continue to pay his compensation, Mr. Hegarty did not have the benefits or appurtenances of employment.  He had

no access to his email, his office, on-line resources, or the like.  He was directed to wait to hear from Human Resources, a request with which he complied.

17.     At this same time, BNY Mellon's HR department failed to reach out to Mr. Hegarty about the offboarding process. Mr. Hegarty was still not given, nor did he have access to, the offboarding document, which at the time he did not know existed, and that is specifically designed to provide information to exiting employees about their accumulated benefits, including stock options.

18.     For over two (2) months BNY Mellon failed to give Mr. Hegarty any notice about his stock options. Mr. Hegarty was denied access to BNY Mellon systems, including the BNY Mellon "internal" proprietary trade pre-clearance system also known as the Personal Trading Assistant (PTA).

19.     Mr. Hegarty was also denied access to "My Source," and other internal BNY HR sites after March 21, 2019.

20.     Both the PTA system and My Source would have provided Mr. Buchko with additional necessary information concerning the stock options and the means by which to pre-clear the transaction so that the options could be exercised without violating SEC rules or BNY policies.

21.     Mr. Hegarty remained an employee and was paid his salary through May 19, 2019.

22.     Mr. Hegarty was considered an Access Decision Maker (ADM) under the BNY Mellon's Personal Securities Trading Policy and was subject to BNY Mellon's preclearance trading rules.

3

23.     As such, while he had the ability to exercise his options by trading them, due to BNY Mellon's Personal Securities Trading Policy, he was required to pre-clear such trades through the PTA system.

24.     BNY's 2019 Policy explicitly states that "[i]n order to trade securities (excluding exempt securities), ADM Employees…are required to submit a preclearance request in the PTA system and receive notice that the preclearance request was approved prior to placing a security trade."

25.     It was not possible for Mr. Hegarty to exercise his vested options once BNY Mellon locked him out of the PTA system on March 21, 2019.

26.     On May 20, 2019 Mr. Hegarty's stocks were terminated without notice.

27.     BNY Mellon's decision incurred a full loss of earned value for Mr. Hegarty.

***Stock Options***

28.     Over the course of Mr. Hegarty's twenty (20) year employment with BNY he accumulated numerous benefits owed.

29.     One such benefit was an interest under the Company's stock plans as to which Fidelity Stock Plan Services LLC provided limited administrative and record keeping services.

30.     Mr. Hegarty's stock options were earned as part of the benefits program with BNY Mellon pursuant to which he received Non-Qualified Stock Option grants as follows:

   a.  1,286 options on March 16, 2010;

   b.  908 options on February 24, 2011; and

   c.  1703 options on February 23, 2012.

4

31.    All options were fully vested and exercisable and none of the options had expired as of March 19, 2019.

## *The BNY Long-Term Incentive Plan*

32.    BNY periodically issued plan documents and prospectuses with respect to the long-term incentive plans.

33.    Subsequent to his active removal from BNY, the most current Plan information available on the Fidelity website was entitled "The Bank of New York Mellon Corporation 2019 Long-Term Incentive Plan."  Exhibit 1 attached.

34.    On the subject of Option Exercise and Term the 2019 document provided:

> "(d)Exercisability and Term. Options shall become exercisable at such time or times and/or upon the occurrence of such event or events as may be determined by the Committee. The vesting period applicable to Options granted to employees shall, in the case of time-based vesting, be not less than three years, with no more frequent than ratable vesting over such period or, in the case of performance-based vesting, be not less than one year; provided, however, that up to five percent (5%) of those shares available for Awards following stockholder approval of the Plan as provided in Section 2.4 may be granted as Options with no minimum vesting period. No Option shall be exercisable after the expiration of ten years. To the extent exercisable at any time, Options may be exercised in whole or in part. Each Option shall be subject to earlier termination as provided in the Award Agreement."

35.    The 2019 Plan Document available to Mr. Hegarty at time of his active removal from employment did not address early termination of vested options.

## *The Non-Statutory Stock Option Agreement*

36.    Subsequent to the termination of the options, BNY provided to Mr. Hegarty a "NONSTATUTORY STOCK OPTION AGREEMENT" which it represented to accompany

options granted in 2010, 2011 and 2012  and identified the documents issued as part of the grant

of stock options during his employment.  Exhibits 2, 3 and 4 attached.

37.     The Options at issue were granted in the years 2010, 2011 and 2012.

38.     At paragraph 2.2 of Exhibit 2 the NONSTATUTORY STOCK OPTION

AGREEMENT provides "To the extent vested, the Option may be exercised in whole or in part

from the date of vesting through and including the Option Expiration Date…subject to any limits

provided in Section 3 of this Agreement."

39.     The NONSTATUTORY STOCK OPTION AGREEMENT at Paragraph 3.1

states "'Termination Date' shall mean the date upon which you cease performing services as an

employee of the Corporation, without regard to accrued vacation, severance or other benefits or

the characterization thereof on the payroll records of the Corporation;"

40.     "Payroll Separation Date" is defined in relevant part in Paragraph 3.1 as "the last

day for which you receive salary continuance or separation/transition pay from the Corporation,

if any…"

41.     Section 3.2 addresses "Specified Terminations of Employment." In relevant part,

that section provides:

42.     "Termination Without Cause/With Cause.  If your employment is terminated by

the Corporation 'without cause,' as defined in Section 3.5(e) of the Plan[1], …you will have thirty

days following the Termination Date to exercise the portion of the Option that was vested on the

Termination Date; provided, however, if you are entitled to separation/transition pay from the

Corporation, …the vested portion of the Option may be exercised for one year following the

Payroll Separation Date…"

---

[1] Mr. Hegarty has not been able to identify Section 3.5(e).

6

43.     As of March 2019, Mr. Hegarty had accrued 3,897 exercisable and vested options evidencing a total market value of $92,749.08 and maintained in a Fidelity Investment Account as part of the services Fidelity provided to BNY Mellon.

44.     Although Mr. Hegarty provided 60-day notice of intent to terminate his employment, by its actions, BNY removed Mr. Hegarty from active employment on March 21, 2019 but continued to provide salary continuation or transition pay through May 19, 2019.

45.     Mr. Hegarty should have been provided one (1) year from the Payroll Separation Date to exercise his options based upon his removal from active employment on March 21, 2019 and salary continuation through May 19, 2019.

46.     Mr. Hegarty was precluded from exercising his options at any time after March 21, 2019 by the actions and conduct of BNY.

*__BNY Preclearance Trading Rules__*

47.     Mr. Hegarty was considered an Access Decision Maker (ADM) under the BNY Mellon's Personal Securities Trading Policy and was subject to BNY Mellon's preclearance trading rules.

48.     As previously stated, due to BNY's policies ADM Employees are required to receive preclearance approval in PTA prior to executing trades in all securities (excluding exempt securities).

49.     BNY, Policy state that "[i]n order to trade securities (excluding exempt securities), ADM Employees, Investment Employees, Insider Risk Employees, and PREG Employees are required to submit a preclearance request in the PTA system and receive notice that the preclearance request was approved prior to placing a security trade.

50.     BNY's 2019 Personal Securities Policy specifically addresses Mr. Hegarty's Company Stock and how it must be precleared through the PTA.

51.     In BNY's 2019 Personal Securities Policy, Appendix E: Trade Preclearance Requirements, section B: Preclearance Rules for Company Stock in Retirement and Benefit Plans states that "Preclearance approval is required prior to the exercise of stock option grants."

52.     Under this Policy, Mr. Hegarty had to clear his stock options, through the PTA prior to exercising them.

53.     When Mr. Hegarty was involuntarily escorted out of his work premises, Mr. Hegarty was also barred access to the PTA.

54.     No agent of BNY contacted Mr. Hegarty to begin the offboarding process.

55.     No agent of BNY contacted Mr. Hegarty to discuss the handling of his contractually-granted stock options.

56.     No agent of BNY contacted Mr. Hegarty to grant him access to the PTA.

57.     As a result of this failure on the part of BNY, Mr. Hegarty could not access the PTA at, or subsequent to, the time of his departure.

58.     At the time he tendered notice of employment termination, Mr. Hegarty did not know and was not advised of any timing issues related to the termination of vested options commensurate with termination of employment and from the posted 2019 Plan Document, no such earlier termination period was identified.

59.     Mr. Hegarty at all times understood receipt of benefits would be addressed as part of the offboarding process and to ensure proper exercise of the options and compliance with BNY policies and any applicable securities laws.

8

60.     The offboarding process was denied to Mr. Hegarty prior to the termination of the accrued and vested options.

61.     Mr. Hegarty's lack of access to the PTA interfered with his right to exercise his options, resulting in the loss of the ability to exercise those stock options with a resultant financial loss to him in a minimum amount of $92,749.08.

62.     Further, Mr. Hegarty was deprived of the ability to realize subsequent appreciation in value of the stock or to reap the benefit of making alternative investments with the proceeds he should have received.

## COUNT I

### BREACH OF CONTRACT

63.     The preceding paragraphs are incorporated here as if fully set forth

64.     On and after hire in 1999, the parties were subject to an oral agreement of employment as part of which various terms, conditions and benefits applied to Mr. Hegarty's employment.

65.     Benefits of employment were generally explained through descriptive information published and or provided periodically by BNY.

66.     At all times material hereto, BNY separately maintained within its Human Resource department information that impacted receipt, timing and use of benefits.

67.     BNY maintained possession of that information it is believed at least in part in that the information changed over time and as to different benefits.

68.     For instance, it is unclear whether the terms of the BNY Long-Term Incentive Plans that applied to grants in 2010, 2011 or 2012 either remained in effect when subsequent

9

plans were adopted or were supplanted by later plans, and in fact, a 2019 document made no mention of early termination events that would impact Mr. Hegarty.

69.     Further, there are myriad rules that apply to the various incentive plans impacting such issues as timing of the grant of an option, timing of vesting, expiration of option grants and termination upon the happening of various life and employment events, all of which differ depending on specific circumstances.

70.     It is believed and therefore averred that is in part the reason for the BNY Exiting Employee Information Guide, to provide guidance as to benefit rights upon and following employment termination, regardless the reason for termination.

71.     The Guide further provides contact sources and information for addressing specific benefits.

72.     That Guide was not provided to Mr. Hegarty when he was removed from BNY premises on March 21, 2019 and was thereafter only provided to him after termination of his stock options.

73.     In 2019, Mr. Hegarty could not, without the assistance and direction of BNY that was not provided as promised and required, undertake action needed to exercise the vested and unexpired stock options that had been granted to him 7-9 years earlier.

74.     Without information and assistance of BNY, Mr. Hegarty was not in a position to be able to determine what he needed to do or to take action to preserve his interest in the vested stock options.

75.     As stated above and to his knowledge, in order to exercise his contractually granted stock options, Mr. Hegarty had to process them first through the PTA.

76.     As stated above, Mr. Hegarty was locked out of the PTA system immediately after he was involuntarily escorted from his work premises.

77.     Mr. Hegarty was told that an agent of BNY's HR department would contact him to discuss the handling of his benefits, including his stock options.

78.     No agent of BNY met with Mr. Hegarty nor contacted him subsequent to his removal from BNY premises to begin the offboarding process.

79.     No agent of BNY met with Mr. Hegarty nor contacted him subsequent to his removal from BNY premises to discuss his stock options.

80.     No agent of BNY met with Mr. Hegarty nor contacted him subsequent to his removal from BNY premises to grant him access to the PTA, to clear his stock options.

81.     This failure on the part of BNY interfered with Mr. Hegarty to exercise his contractually granted stock options.

82.     This resulted in a clear breach of contract, as Mr. Hegarty was unable to exercise a benefit acquired through employment, his contractually granted, vested and unexpired stock options.

83.     Mr. Hegarty fulfilled his obligations to BNY under the contract and did not engage in any conduct that constitutes a breach on his part.

84.     As a direct and proximate result of the aforementioned breach by BNY, Mr. Hegarty has suffered harm and was deprived of compensation owed to him through the ability to timely exercise vested stock options. Mr. Hegarty suffered a loss as set forth hereinafter .

WHEREFORE, for the foregoing reasons, Plaintiff, Patrick Timothy Hegarty requests that the Court grant the relief prayed for hereinafter.

## COUNT II

### VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT & COLLECTION LAW

85.     The preceding paragraphs are incorporated here as if fully set forth.

86.     The Pennsylvania Wage Payment and Collection Law ("WPCL") provides a remedy for an employee to recover wages and benefits contractually due to him.  43 P.S. § 260.1 *et seq.*

87.     BNY is an "employer" within the definition of the WPCL.  43 P.S. § 260.2(a).

88.     The WPCL states that "wages" includes "[A]ll earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation.  The term "wages" also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employees' pay by the employer."  43 Pa. Stat. Ann. § 260.2(a).

89.     The WPCL further provides that "fringe benefits or wage supplements" are defined as including:

> all monetary employer payments to provide benefits under any employee benefit plan, as defined in section 3(3) of [ERISA], as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employees' pay by the employer; and any other amount to be paid pursuant to an agreement to the employee, a third party or fund for the benefit of employees.

*Id.*

90.     The stock options were granted, fully vested and had not expired at the time the options were terminated.

12

91.     Employee stock option plans are not employee benefit plans subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C.S. § 1001 et seq., because their purpose is to operate as an incentive and bonus program, and not as a means to defer compensation or provide retirement benefits.  *Matiella v. DIRECTV, Inc.,* 2012 U.S. Dist. LEXIS 14972, *1, (S.D. N.Y. 2012) 53 Employee Benefits Cas. (BNA) 2101, 2012 WL 363037.

92.     The salary and benefits (including the stock options) due and owing to Mr. Hegarty pursuant to the agreement between the parties and through the term of the contract constitutes "wages" as that term is defined under the WPCL.  43 P.S. § 260.2(a).

93.     The failure of BNY to allow Mr. Hegarty to exercise his benefits via the exercise of vested stock options set forth hereinabove amounts to a violation of the WPCL.  43 P.S. § 260.1 *et seq.*

94.     Immediately upon learning that his options had been terminated, Mr. Hegarty contacted BNY and reminded BNY that no offboarding process had yet occurred and that he did not have independent access to processes necessary to complete the exercise of the options following termination.

95.     Mr. Hegarty communicated with BNY within days of learning of the termination of his vested options and certainly within less than one (1) year following his Payroll Separation Date.

96.     When BNY removed Mr. Hegarty from business premises and withdrew any access he had to BNY systems, including email, by its actions BNY effected the extended periods of time for Mr. Hegarty to exercise those options within one (1) year from his Payroll Separation Date.

97.     Apart from the unilateral action of BNY in removing him from business premises and foreclosing any access to company systems, including email, Mr. Hegarty would have been in a position to receive communications from Human Resources, and to work directly and internally with Human Resources or other personnel at BNY to exercise the vested options during the period from March 21, 2019 through May 19, 2019.

98.     Upon reaching out to BNY, its Managing Counsel and Director gave no consideration to the representations made to Mr. Hegarty, the failure of BNY to engage in the offboarding process or his removal from access to internal systems during the notice period. BNY declined to reinstate the shares and responded, in part "apparently [Mr. Hegarty] had been planning his resignation for some time, therefore, it stands to reason that this did not take him by surprise and a diligent person would have looked into the timing of the execution."

99.     Further, the conduct of BNY in failing to allow Mr. Hegarty to access the pre-clearance system, therefore effectively curtailing his ability to exercise his vested stock options, under the terms of the contract and in failing to effect the exercise once so advised under the circumstances constitutes a willful violation of the WPCL.

100.    Pursuant to the WPCL, Mr. Hegarty seeks recovery of all wages and benefits due, together with interest, reasonable attorneys' fees and costs.

101.    Mr. Hegarty further believes and therefore avers that the conduct of BNY establishes the absence of a good faith contest or dispute and therefore entitles him to the receipt of liquidated damages as provided for under the WPCL.  43 P.S. § 260.10.

WHEREFORE, for the foregoing reasons, Plaintiff, Patrick Timothy Hegarty requests that the Court grant the relief prayed for hereinafter.

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, Plaintiff, Patrick Timothy Hegarty requests

that the Court grant the following relief against the Defendant, in a sum in excess of the

arbitration limits of the court, including but not limited to the following relief:

a)  The full market value of all stock options as of March 2019 in a minimum amount of

$92,749.08;

b)  Interest at the legal rate or, alternatively, lost growth on the funds on and after March

2019;

c)  Expert fees and other costs of suit;

d)  Attorney's fees;

e)  Liquidated damages; and

f)  Such further legal and equitable relief as this court deems just and proper.


Respectfully submitted,

*s/Vicki K. Horne*
Vicki K. Horne, Esq.
Pa. I.D. #36578
Nicole Daller, Esq.
Pa. I.D. #312224
Samantha Kovalyak, Esq.
Pa. I.D. #328175

HORNE DALLER LLC
1380 Old Freeport Road, Suite 3A
Pittsburgh, PA 15238
412.967.9400
412.967.0465 (fax)
vkhorne@hornedaller.com
ndaller@hornedaller.com
skovalyak@hornedaller.com
*Attorneys for Plaintiff*


15